UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

SEAN MOLINA

           Plaintiff,

    v.

NANCY A. BERRYHILL,

           Defendant.

Case No. 3:16-cv-05262-LB

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Re: ECF Nos. 17 & 18

## INTRODUCTION

Sean Molina moves for summary judgment, seeking judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying his Supplemental Security Income ("SSI") disability benefits under Title XVI of the Social Security Act.[1] Under Civil Local Rule 16-5, the matter is deemed submitted for decision by this court without oral argument. All parties have consented to magistrate jurisdiction.[2]

The court denies Mr. Molina's motion and grants the Commissioner's cross-motion for summary judgment.

---

[1] Motion for Summary Judgment – ECF No. 17 at 1. Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Consent Forms – ECF Nos. 9, 10.

**STATEMENT**

**1. Procedural History**

In March 2012, Sean Molina, then age 42, filed a disability claim under Title XVI of the Social Security Act, alleging mental and physical impairments beginning on June 1, 2007, which was later amended to March 22, 2012.[3] The Commissioner denied his claims initially and upon reconsideration.[4] Mr. Molina timely appealed to Administrative Law Judge Mary Parnow (the "ALJ").[5] The ALJ held a hearing and heard testimony from Mr. Molina (represented by counsel), Angelina Collaco (the mother of his children), and a vocational expert.[6] The ALJ issued an unfavorable decision on March 5, 2015.[7] Mr. Molina appealed to the Appeals Council,[8] which denied review.[9] Mr. Molina timely filed this action and moved for summary judgment or in the alternative for remand to the ALJ for further consideration.[10] The Commissioner responded and filed a cross-motion for summary judgment,[11] and Mr. Molina replied.[12]

**2. Summary of Record and Administrative Findings**

**2.1 Medical Records**

**2.1.1 Dr. Kayman: Treating Physician**

On February 17, 2012, Mr. Molina was seen by Joshua Kayman, M.D.,[13] who noted that Mr. Molina's initial chief complaint was marital difficulties.[14] Dr. Kayman treated Mr. Molina for four

---

[3] Administrative Record ("AR") 37, 79; *cf.* AR 171 (noting April 4, 2012 filing date).

[4] AR 19.

[5] AR 106.

[6] AR 34–64.

[7] AR 16–29.

[8] AR 248.

[9] AR 1.

[10] Motion for Summary Judgment – ECF No. 17 at 19.

[11] Cross-Motion – ECF No. 18.

[12] Reply – ECF No. 21.

[13] AR 280–82.

[14] AR 280. Although the record is inconsistent, it appears that Mr. Molina and Ms. Collaco, the mother

sessions between February 2012 and July 2012.[15] Almost two years later, in late June 2014, shortly before the ALJ hearing ,Dr. Kayman saw Mr. Molina one time and prepared a letter and a mental-impairment questionnaire for Mr. Molina.[16]

In February 2012, Dr. Kayman diagnosed Mr. Molina with PTSD.[17] Mr. Molina reported that his "attitude sometimes was snappy" and that due to his prior gang affiliation, he was "scared all the time" because he was "high up" in the gang and "a threat to the organization because he knows a lot."[18] As a result, Mr. Molina reported that he "[s]leeps poorly," "[a]voids people," "[h]as nightmares that he doesn't remember," has flashbacks, and "[h]as seen horrible violence."[19] Even though he reported leaving the gang about 10 years earlier, he said that there were still guys "'hunting for him'"[20] Mr. Molina said that while he did not feel "unsafe" in his house, he was "really worried."[21] He also recounted being severely assaulted eight months earlier (in June 2011).[22]

He reported "do[ing] construction" and working briefly as a truck driver but having to quit.[23] He gets "angry" and feels "invisible" because he "can't support [his] family" and argues with his spouse "over tiny things," but denied ever hitting her and reported that he "raised" and takes "care of the kids" while his wife works as a medical administrator and pursues a nursing degree.[24]

---

of his two children, are not married though he reported being married for 12 years (since 2000). *Compare* AR 281, *with* AR 36. For ease of reference, the court generally will refer to Ms. Collaco as his "spouse."

[15] AR 277–82.

[16] AR 351, 352–54, 355–56.

[17] AR 281.

[18] AR 280.

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] AR 280–81.

Mr. Molina reported a troubled personal history, noting that he was abused in foster care, sent to California Youth Authority at age 13, and subsequently was incarcerated repeatedly for more than half of his life until age 32.[25] He reported that he had never been hospitalized for psychiatric treatment, but saw a psychiatrist 15 years ago and took Zoloft while in prison.[26] He reported some suicidal ideation but "never made [an] attempt."[27] He denied any substance abuse, but indicated that he used marijuana once a week and drank alcohol a few times a year.[28] Mr. Molina claims to have been hit in the head "a lot" while in prison, but never "with loss of consciousness."[29]

In his "Mental Status Exam," Dr. Kayman noted that Mr. Molina's appearance was "[f]airly well groomed," his behavior was "[n]ormal gait[, n]o tremor," his speech rate, tone, and volume was "unremarkable," and his insight and judgment were "fair."[30] His thought process was "[l]inear and goal directed," and his thought content was without suicidal or homicidal ideation or auditory or visual hallucinations or obsession, but his mood was "anxious" and his affect was "tearful."[31]

Dr. Kayman found that Mr. Molina presented a "low/nil" suicide risk and that "[d]espite [his] history of psychological instability," Mr. Molina was "accessing care appropriately," establishing "a relationship with providers at this clinic, and making hopeful plans for the future." [32] Dr. Kayman prescribed 25 mg of sertraline (Zoloft) daily with a goal of upping it to 200mg, social-worker help for anger management, and a four-week follow-up and a subsequent prescription for prazosin (for the nightmares).[33]

---

[25] AR 281.

[26] AR 280. "Zoloft" is a brand name for Sertraline, a prescription medication used to treat depression, anxiety, PTSD, and other ailments. *See* PubMed Health, *Sertraline (By Mouth)*, https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012108/ (last visited June 22, 2017).

[27] *Id.*

[28] *Id.*

[29] AR 281.

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *See* AR 281–82; *see also* AR 277–78 (noting Prazosin "to address ongoing nightmares").

One month later, in March 2012, Dr. Kayman saw Mr. Molina again, noting that Mr. Molina "[f]elt a little more relaxed" although he was still having "sleep problems."[34] Dr. Kayman's findings on Mr. Molina's "Mental Status Exam" remained unchanged from his prior exam.[35] Dr. Kayman reported that Mr. Molina was "[d]oing better on [Z]oloft."[36] Dr. Kayman listed Mr. Molina with a GAF score of 55.[37] Dr. Kayman increased Mr. Molina's Zoloft dosage to 50 mg per day and started Mr. Molina on Prazosin.[38]

In May 2012, Dr. Kayman examined Mr. Molina a third time.[39] Mr. Molina reported "sleeping better" with "[n]o nightmares," although his spouse reported him "yelling in his sleep."[40] Dr. Kayman's notations on Mr. Molina's "Mental Status Exam" remained unchanged from his prior exams as did his assessment and GAF rating of Mr. Molina from the March exam.[41] Dr. Kayman extended the follow-up exam period from four weeks to six to eight weeks and kept the Zoloft dosage at 50 mg per day.[42]

---

[34] AR 279.

[35] *Compare* AR 279, *with* AR 281.

[36] AR 279.

[37] *Id.* A GAF score purports to rate a subject's mental state and symptoms; the higher the rating, the better the subject's coping and functioning skills. *See Garrison v. Colvin*, 759 F.3d 995, 1002 n.4 (9th Cir. 2014) ("A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment.") (internal quotations omitted). "A GAF score between 51 to 60 describes "moderate symptoms" or any moderate difficulty in social, occupational, or school functioning. Although GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability (or interact with physical impairments to create a disability), they may be a useful measurement." *Id.* (internal quotation marks omitted).

[38] AR 279; *see also* AR 278 (noting that Prazosin was "to address ongoing nightmares"). Prazosin has been used "off label" in PTSD treatment and may help reduce stress and nightmares and improve sleep. *See* Simon Kung, Zelde Espinel & Maria Lapid, *Treatment of Nightmares with Prazosin: A Systematic Review*, Mayo Clinic Proceedings 2012 Sept. 87(9), 890–900, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3538493/ (reviewing treatment of PTSD nightmares with Prazosin).

[39] AR 278.

[40] *Id.*

[41] *Id.*

[42] *Id.*

In July 2012, Dr. Kayman examined Mr. Molina again (for the last time in 2012).[43] Mr. Molina reported that he had "left [his] welfare program when he felt disrespected."[44] As a result, Mr. Molina and his spouse could no longer "afford their place," and his spouse "is going to live with [her] family" and he was going to live with an aunt in Stockton.[45] Mr. Molina indicated that he had issues with some of his spouse's family members and that he was "sad" to break up his family, but he wanted to avoid fighting with his spouse's family in front of his children.[46] Mr. Molina reported that he had stopped his medication, but had recently restarted it.[47] He reported alcohol and marijuana use.[48] He also reported some suicidal ideation during this period, but indicated that he is now "feeling better."[49] Dr. Kayman's notations on Mr. Molina's "Mental Status Exam" remained unchanged from his prior exams except that his "Mood" notation changed from "anxious" to "angry" and his "Affect" from "tearful" to "mood congruent."[50] Dr. Kayman's overall assessment remained unchanged as did his GAF scoring and the previously extended (six-to-eight week) follow-up exam interval.[51]

There are no treatment notes from Dr. Kayman or any other treatment records from July 2012 until June 2014 and the record does not reflect that Mr. Molina sought or received any mental-health treatment during this interval.[52] On June 26, 2014, almost two years after his last session with Mr. Molina, Dr. Kayman wrote a letter stating that Mr. Molina had returned to Dr. Kayman that day and that his condition was "significantly worse."[53] Dr. Kayman noted that Mr. Molina had

---

[43] AR 277.

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Compare id.* (Dr. Kayman's last treatment notes from July 11, 2012), *with* AR 351 (letter from Dr. Kayman, noting that he treated Mr. Molina until October 2012, but with no treatment notes beyond July 2012).

[53] AR 351.

lost weight, looked "disheveled," had "increased anxiety" and continued to have "nightmares" that "cause disabling sleep problems," and was "unable to interact appropriately with the general public due to his concern for his safety."[54] Dr. Kayman opined that that Mr. Molina's "safety concerns are out of proportion to his actual level of risk."[55] Dr. Kayman noted that Mr. Molina had a "foreshortened sense of the future and suicidal ideation" and that he "believe[s] that [Mr. Molina] continues to be disabled and unable to work due to his mental illness."[56] On July 2, 2014, Dr. Kayman completed a mental-impairment questionnaire, finding that Mr. Molina had "marked" or "extreme" mental impairments in 10 of the 14 categories contained in the questionnaire and finding that those impairments would interfere with Mr. Molina's concentration or pace of work for 50% of the work day and would cause him, on average, to miss more than 4 days per month.[57]

### 2.1.2 Dr. Rana: State Agency Examining Physician

On August 6, 2012, Farah Rana, M.D., examined Mr. Molina and performed an internal-medicine consultative evaluation at the request of the State agency to assess his physical impairments.[58] Mr. Molina reported three chief complaints: right shoulder pain, hiatal hernia, and PTSD/depression and anxiety.[59] Dr. Rana reported that Mr. Molina indicated that "[h]e can do his day-to-day activities without any problem."[60] Mr. Molina stated that his right shoulder was injured during an assault.[61] Although he did not seek immediate medical attention, he reported seeing a doctor several months later, who diagnosed a rotator-cuff injury.[62] Mr. Molina said he was

---

[54] Id.

[55] Id.

[56] Id.

[57] AR 352–53.

[58] AR 289–91.

[59] AR 289.

[60] Id.

[61] Id.

[62] Id.

prescribed exercises, but no surgery was recommended.[63] Mr. Molina reported that his shoulder

hurts when lifting or carrying heavy objects and that he sometimes feels numbness and tingling in

his right arm and hand, but no neck pain.[64] Dr. Rana noted "[n]o tenderness . . . on palpation in

[the] right shoulder" and that "[r]ange of motion at both shoulder joints is within normal limits,"

as were the range of motion in his other joints, which were "nontender" and without signs of any

"localized inflammation or swelling."[65] Dr. Rana observed no muscle wasting in Mr. Molina's

right upper arm or forearm.[66] Dr. Rana also noted a "well-healed" scar in Mr. Molina's epigastric

area and no visible hernia and normal bowel sounds, although Mr. Molina reported mild

tenderness in the epigastric area, but no lower back tenderness.[67]

Dr. Rana reported that Mr. Molina (1) presented with right shoulder pain, but exhibited no

tenderness or range of motion deficit in that area, (2) reported a history of hiatal hernia with post-

repair surgeries, and (3) reported a history of PTSD/depression and anxiety.[68] Dr. Rana found that

Mr. Molina "does not have any sitting, standing or walking limitations" and "can carry 25 pounds

frequently and 50 pounds occasionally[,] and this limitation is because of history of hiatal hernia

and his right shoulder pain."[69] Dr. Rana noted no limitation in his ability to "handle, manipulate,

feel, and finger objects" and found that he does not need any assistive device and can take public

transportation.[70]

---

[63] *Id.*

[64] *Id.*

[65] AR 290.

[66] *Id.*

[67] *Id.*

[68] AR 291.

[69] *Id.*

[70] *Id.*

### 2.1.3 Dr. Bodepudi: State Agency Examining Psychiatrist

On August 13, 2012, Arudra Bodepudi, M.D., examined Mr. Molina and performed a psychological evaluation at the request of the State agency.[71] Dr. Bodepudi noted that Mr. Molina reported a long history of criminal and gang-related activities and violence as well as repeated incarceration.[72] Mr. Molina indicated that he could not "get a job because of his gang related tattoos" and his fear that he is on a "hit list" from his former gang colleagues and a target of rival gangs.[73] He also reported a history of "being stabbed and shot several times."[74] Dr. Bodepudi noted that Mr. Molina last worked as a delivery driver, but was fired for slapping his boss."[75] Mr. Molina reported that he was born and raised in Stockton, California, but because of his gang affiliations, he "moved to Oakland to be safer."[76] Mr. Molina indicated that he had a 10th-grade education and a GED and had never been hospitalized for any psychiatric conditions.[77] Dr. Bodepudi noted that Mr. Molina's chief complaints were "PTSD and Stress."[78]

Mr. Molina also stated that his "sleep, energy, appetite and weight are okay and [his] mood swings are between normal and sad."[79] Dr. Bodepudi noted that Mr. Molina was on Zoloft and another medication, has used marijuana "off and on" since his teens (but not while incarcerated), and had last used marijuana the previous week, but denied any abuse of alcohol, cocaine, heroin, amphetamines, or other narcotics.[80] Dr. Bodepudi reported that Mr. Molina "is able to [do] everything that is needed in daily activities," including dressing, doing laundry, watching TV, visiting with friends and family and other activities, but because he was living in a "transitional

United States District Court
Northern District of California

---

[71] AR 292–95.

[72] AR 292, 293, 295.

[73] AR 292.

[74] *Id.*

[75] *Id.*

[76] AR 293.

[77] *Id.*

[78] AR 292.

[79] AR 293.

[80] *Id.*

facility," he was not required to cook meals.[81] Dr. Bodepudi found that Mr. Molina's speech was mostly normal in "rate, tone and volume" and that he was able to converse "OK," but was "at times . . . argumentative."[82] Dr. Bodepudi reported that Mr. Molina's thought process was "[g]oal directed" and that Mr. Molina denied any suicidal or homicidal ideations or any delusions or paranoia.[83] Mr. Molina was able to do "Calculations" with "ease," and Dr. Bodepudi found Mr. Molina to be cognitively alert, with "Excellent" functioning in his "Fund of Knowledge," "Similarities/Differences," "Concentration," "Abstraction," and "Insight/Judgment."[84]

Dr. Bodepudi diagnosed Mr. Molina with "Cannabis induced mood disorder," ruled out a mood-disorder diagnosis "due to general medical condition," and assigned him a GAF of 70 and a "fair" prognosis.[85]

Functionally, Dr. Bodepudi found "no impairment to perform work activities on a consistent basis" and "no impairment to understand/remember/complete" simple or complex instructions, but found "moderate impairment to interact appropriately with supervisors/coworkers/public" based on his history of "slapping his boss."[86]

### 2.1.4 Drs. Jacobson and Greene: State Agency Non-Examining Physicians

In February 2013, Drs. Jacobson and Greene (both M.D.s) reviewed Mr. Molina's claims of "PTSD; Depression; Anxiety; Irritable bowel syndrome: Back Pain; Insomnia; Damaged rotator cuff" and his medical history, including his treatment with Dr. Kayman and his examinations with Dr. Bodepudi and Dr. Rana.[87] In assessing Mr. Molina's physical impairments, Dr. Greene gave "great weight" and generally concurred with Dr. Rana's conclusions that Mr. Molina's physical

---

[81] AR 293–94.

[82] AR 294.

[83] Id.

[84] Id.

[85] AR 295.

[86] Id.

[87] AR 79–90.

residual functional capacity ("RFC") enabled him to work but limited him to lifting a maximum of 50 pounds with frequent lifting of 25 pounds.[88]

In his assessment of Mr. Molina's mental residual functional capacity, Dr. Jacobson gave "great weight" to Dr. Bodepudi's examination findings and noted that Mr. Molina had no limitation on understanding and memory and was able to "maintain complex instructions" during a 40-hour workweek, but did have "moderate" social interaction limitations with the public, co-workers, and supervisors (but that his anger and irritation issues did not preclude such interactions).[89]

### 2.1.5 Dr. Spivey: State Agency Examining Psychologist

On November 22, 2013, Patricia Spivey, Psy.D., examined Mr. Molina and performed a psychological examination at the State agency's request.[90] She noted that Mr. Molina reported a long history of criminal and gang-related activities, including being "very high up in the gang at one point."[91] As a result, Mr. Molina reported that he "was constantly in fear for his life" and experienced violent nightmares.[92] Mr. Molina indicated that he was born and raised in Stockton, and was abused by his mother as a child and eventually placed in the California Youth Authority.[93] He also reported having finished his GED in prison.[94] After being paroled, Mr. Molina reported working at a meat company, but "that he did not get along with authority figures and [was] fired for slapping his boss."[95] Mr. Molina indicated that he had never been hospitalized for any psychiatric conditions.[96]

---

[88] AR 86–87.

[89] AR 87–88.

[90] AR 317–20.

[91] AR 317.

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *Id.*

Dr. Spivey noted that Mr. Molina's chief complaint was "posttraumatic stress disorder."[97] Mr. Molina indicated that he was on Zoloft and "used marijuana daily for many years," but denied any substance abuse.[98] Dr. Spivey reported that Mr. Molina "can drive," "can live alone," "can clean the house and do laundry," "can go to the store," and "sometimes takes care of his children and takes them places."[99] Dr. Spivey noted that his speech was low and that he appeared to be "somewhat anxious," but was "generally cooperative with testing and appeared to be giving a full effort."[100]

Dr. Spivey ran a series of tests on Mr. Molina and concluded that "[c]ognitively [Mr. Molina] [was] well within normal limits," noting that "[t]here does not appear to be any sign of a thought disorder," but that his fears of attack by gang members "do not appear to be rational" and that his history and presentation was "suggestive of a personality disorder" based on his acknowledged "anger" issues and his worry about "snapping easily" especially around "his children."[101] Dr. Spivey concluded that "[t]here was nothing acute," and she expected little change overtime.[102]

Dr. Spivey found no impairment in Mr. Molina's ability to communicate verbally or in writing or to follow simple or complex instructions, or maintain adequate pace or persistence to complete simple tasks though potentially some "[m]ild" difficulties in his ability to maintain adequate pace and persistence to complete complex tasks or to adapt to changes in job routines.[103] Dr. Spivey also found "[m]oderate" impairments in Mr. Molina's ability to maintain adequate concentration, to withstand the stress of routine work, and to maintain emotional stability/predictability.[104] Dr. Spivey also noted "[m]oderate" impairments in his ability to "interact appropriately with co-

_____

[97] Id.
[98] Id.
[99] AR 318.
[100] Id.
[101] AR 319.
[102] Id.
[103] Id.
[104] Id.

workers, supervisors and the public on a daily basis."[105] Dr. Spivey also completed a "work

activities" questionnaire where she noted that Mr. Molina had "moderate" impairments — defined

in the questionnaire as "more than a slight limitation" but an area where "the individual is still able

to function satisfactorily" — in his ability to carry out complex instructions or "make judgments

on complex work-related decisions."[106] In this assessment form, Dr. Spivey also found that Mr.

Molina would have "moderate" difficulties interacting with the public, co-works, or supervisors or

responding to usual work situations or changes to routines.[107]

### 2.1.6 Dr. Wiebe: Claimant's Examining Psychologist

On December 18, 2013, Katherine Wiebe, Ph.D., performed a psychological examination and

various tests on Mr. Molina[108] at the referral of Mr. Molina's attorney.[109] Dr. Wiebe noted that Mr.

Molina reported being beaten as a child by his mother and thereafter lived with various family

members until ending up in a group home, where he was threatened and ran away, eventually

being placed in the California Youth Authority.[110] Mr. Molina reported that his mother visited him

only once while he was in Youth Authority and then only to tell him that he was "no longer [her]

son — you no longer exist."[111] In response to his mother's abuse and abandonment, he attacked

someone with a "lock in a sock" and was sent to a special section in the Youth Authority for "guys

that are over 16 and out of control," which he described as "gladiator school."[112] Thereafter he

reported his involvement in gang-related activities and violence and numerous incarcerations.[113]

---

[105] AR 320.

[106] AR 321; *compare* AR 319, *with* AR 321 (for factors supporting this assessment, Dr. Spivey referred back to her report even though that report found no impairment in Mr. Molina's ability to "follow complex instructions").

[107] AR 322.

[108] AR 332–50.

[109] AR 332.

[110] AR 333–34.

[111] AR 334.

[112] *Id.*

[113] *Id.*

Mr. Molina reported that, when not incarcerated, he has been with the mother of his two children since 1998 and was living with her at the time of Dr. Wiebe's evaluation.[114] Dr. Wiebe noted Mr. Molina's numerous tattoos, which he "now considers[] 'an embarrassment'" and tries to hide or cover up, as he considers then to be a source of danger because they are linked to his prior gang activity.[115] Mr. Molina reported his continued estrangement with his mother and his trauma over his father's suicide in 1990.[116] Mr. Molina noted his learning difficulties with math and reading, and that he was now unclear whether he had actually received his GED, as he may be "missing two credits."[117]

Dr. Wiebe ran a series of tests and assessments on Mr. Molina and concluded that his cognitive function, as measured by IQ, was "likely in the average to above average" range.[118] Dr. Wiebe found his "Attention/Concentration/Persistence" to be mildly impaired, his "[e]xecutive [f]unctioning" to be normal, and his "[m]emory" to be "in the moderately to severely impaired range," but that "[o]verall, his performance suggests he is able to encode and store new information with multiple repetitions of that information."[119] His "[l]anguage" "functioning is normal," but he was deemed "mildly impaired" on his "Visual/Spatial Abilities" based on being in the "low range average" on one of the relevant tests.[120] Based on evidence of his being tired and Mr. Molina's self-report of "being easily fatigued," Dr. Wiebe found Mr. Molina to be mildly impaired in his "Sensory/Motor Abilities," "due to problems including insomnia, and depressive fatigue."[121]

On emotional functioning, Dr. Wiebe found Mr. Molina showed signs of "severe depression," with feelings of sadness, hopelessness, guilt, restlessness, disappointment, and suicidal thoughts,

---

[114] *Id.*

[115] *Id.*

[116] *Id.*

[117] AR 335.

[118] AR 337.

[119] AR 337–38.

[120] AR 339.

[121] *Id.*

which he indicated "he would not carry out."[122] These feelings manifested themselves in low energy, decreased appetite for food and other life activities, sleeping "somewhat less than usual," and difficulty keeping "his mind on anything for very long."[123] Dr. Wiebe also found that he exhibited "moderate anxiety," manifested by feelings of loss of control, nervousness, and "mild difficulties" with "being unable to relax," "lightheadedness," "feeling terrified," "indigestion," and other symptoms.[124] Dr. Wiebe also noted that Mr. Molina had reported being previously diagnosed with a "bipolar disorder" which manifested itself with periods (ranging from days to weeks) of lethargy, excess sleep, hopelessness, and low motivation, followed by relatively "normal" periods with his energy and mood and general functioning "feeling right" or "high energy periods" where he is "sometimes" more productive than normal, but also sometimes more irritable.[125] Mr. Molina also reported experiencing "racing" thoughts and that he would sometimes just "snap" getting "mad" though he found the use of marijuana and music to be helpful.[126] Mr. Molina reported to Dr. Wiebe that although he was feeling "'alright'" during the assessment, he had experienced a wide range of positive and negative emotions in his life and he feared for himself and his family, for whom he cared strongly, because of his past gang activities.[127] Mr. Molina noted that he is a "loner" and sometimes has "bad moods without having any reason," but denied being abusive to his children (of whom he is proud) and noted being hopeful "to a degree" about the future and that "he likes himself."[128] Mr. Molina reported some trouble falling or staying asleep and frequent nightmares, but denied having any trouble concentrating, reporting that he was a "planner" and sometimes "concentrate[s] too much."[129] He also noted that he tries to "solve the problem before it comes to a violent or bad . . . end" and stated that he is "grateful" for his "kids, [be]cause they

---

[122] Id.

[123] Id.

[124] Id.

[125] AR 340.

[126] Id.

[127] Id.

[128] AR 341.

[129] Id.

United States District Court
Northern District of California

make [him] think (before acting)."[130] He noted that his "spouse" was studying for her nursing degree but that Mr. Molina was struggling, doing "applications all day, (but) they say 'no'."[131] Dr. Wiebe went on to report that Mr. Molina has "feelings of guilt or worthlessness, reporting 'since I can't get a job, can't take care of my kids, can't get them what they want [he cried quietly].'"[132]

Mr. Molina reported that he is "generally able to clean and cook, and [was] showering every day," but he avoids going to the store or does so "'very quickly'" to avoid "other people."[133]

Dr. Wiebe concluded that Mr. Molina had "psychiatric and personality disorder problems that also affect his cognitive functioning."[134] Dr. Wiebe found that "Mr. Molina experiences psychiatric symptoms including frequent nightmares, flashbacks, paranoia, anger reactivity, insomnia, depression, anxiety, irritability, and fatigue" and that as a result he would likely experience difficulties "sustaining attention, pace, and persistence; and being able to attend to, remember and follow through with directions and tasks in full-time employment."[135]

Dr. Wiebe also found that his psychiatric symptoms also would likely "affect his ability to relate to others" and would make it "difficult for him to communicate and interact effectively with coworkers, supervisors, and the public in a work environment" and that his "insomnia, anxiety, and depressive fatigue symptoms[] also may result in [Mr. Molina] being unable to reliably[] maintain a regular work schedule."[136]

Dr. Wiebe ruled out a variety of disorders, but diagnosed Mr. Molina with severe PTSD and severe Major Depressive Disorder, assessing that "the combination of Mr. Molina's psychiatric, cognitive, and social functioning problems will make him likely unable to work in a full time job

---

[130] *Id.*

[131] *Id.*

[132] AR 342.

[133] AR 341.

[134] AR 346.

[135] *Id.*

[136] AR 346–47.

for at least two years" and recommending "comprehensive psychological treatment and social support."[137]

### 2.2 Mr. Molina's Testimony

Mr. Molina testified in support of his disability claim on July 24, 2014, and was questioned by the ALJ and by his attorney.[138] Mr. Molina testified initially about his educational background and work history.[139] He testified that he had finished the 12th grade but was a few credits short of graduating and had not gotten his GED.[140] Mr. Molina described his work as a driver at Golden Gate Meat Company in 2007, recounting that he had worked there for about six months and that it was "stressful" with long hours (sometimes 10 or even 12 hours a day) making multiple deliveries to restaurants and wineries in the Napa area with no overtime pay.[141] Mr. Molina recounted how when his mother had a stroke and he wanted a day off to see her; the company initially okayed it, but when he went in to work to drop off his truck, his boss told him he had to work that day and when he put his hand in Mr. Molina's face, Mr. Molina slapped him and was let go.[142] Mr. Molina testified that he did not think he could do any job full-time because he gets "nervous" and "frightened" based upon his past gang activities and his tattoos.[143] This nervousness can cause him to get sweaty and for his heart to beat fast.[144] He said that he was on a "hit list" and needs to always stay alert, though he denied that he gets angry easily and instead said he tries to solve "problem[s] in [his] head before [he] make[s] a wrong decision."[145] He also reported flashbacks

---

[137] AR 347.

[138] AR 36–51.

[139] AR 37–40.

[140] AR 37.

[141] AR 38–39.

[142] AR 40.

[143] AR 40–41.

[144] AR 41.

[145] AR 42–43.

and disturbing dreams related to his time in prison and the associated violence.[146] These fears can cause him to "think too much" and interfere with his ability to fall asleep.[147] Mr. Molina indicated that he can focus on tasks, but that his "surroundings" can interfere, if he is too distracted watching out for who is around him.[148]

Mr. Molina testified that he stopped taking Zoloft and his sleep medication as it sometimes kept him up or caused him to over sleep and be tired, and instead, he obtained a prescription for marijuana.[149] Mr. Molina denied the daily use of marijuana previously reported by Dr. Spivey, but indicated that when he did use it, he would take it to the point where he "can't think no more and [is] just knocked out."[150] Mr. Molina later clarified to the ALJ that he uses marijuana 3 to 4 times a month and that he was continuing to take his psychiatric medications.[151] He also stated that he has learned to "keep [his] mind strong and focused," and stay "alert."[152]

Mr. Molina stated that he still sometimes has PTSD symptoms and gets "mad a lot," taking it out on his spouse, not hurting her, but just getting mad at her as he has "no one else to take it out on."[153] Mr. Molina concluded by saying that his future plans were to "[t]ake care of [his] kids" and be a good dad.[154]

On July 12, 2012, Mr. Molina also completed a "Function Report," describing his day as "I eat breakfast, shower, sit around the house or take a walk. Watch TV, clean around the house, take my meds and go to sleep."[155] Mr. Molina also indicated that he had no problem with personal care, preparing his own meals daily, doing laundry, paying bills, writing checks, going places out alone,

---

[146] AR 44.

[147] AR 45.

[148] *Id.*

[149] AR 46.

[150] AR 47–48.

[151] AR 49–50.

[152] AR 50.

[153] AR 48.

[154] AR 50.

[155] AR 224.

but "rarely" shopping, and spending social time with his "kids and their mom."[156] Mr. Molina also reported that his impairments affect his ability to get along with others, but that he finishes what he starts, does a "pretty good" job following written instructions and does "well" following spoken instructions.[157] He also denied ever being "fired or laid off from a job because of problems getting along with other people," but noted his issue of "being around large crowds."[158]

### 2.3 Lay Testimony: Angelina Collaco — Mother of Mr. Molina's Children

Ms. Collaco also testified at the July 24, 2014 hearing.[159] Ms. Collaco stated that she had known Mr. Molina for almost 15 years, but that over the past few years he had become more "irritable," and his personal grooming has deteriorated as well.[160] Ms. Collaco also testified that he has become more emotional and can cry over the "littlest thing" and is "emotionally volatile."[161] Ms. Collaco also testified about his hypervigilance in public places, like at a county fair.[162] Ms. Collaco noted that she has had to become responsible for paying bills as he prefers to "have money in his pocket" and may not pay or pay only half his bills.[163] She also noted that Mr. Molina will just eat out of "necessity" and will just go to a local drugstore for noodle packets rather than go shopping and is more reluctant to go outside the house because he says he feels safer at home, sitting and playing video games.[164] Ms. Collaco also recounted how when they are out, he is often preoccupied about people from his past and feeling that somebody is out to get him.[165]

---

[156] AR 225–29.

[157] AR 229.

[158] AR 230.

[159] AR 51.

[160] AR 52.

[161] AR 53.

[162] AR 53–54.

[163] AR 54.

[164] AR 54–55.

[165] AR 55.

### 2.4 Vocational Expert Testimony: Timothy Farrell

Mr. Farrell, a vocational expert ("VE"), testified at the hearing on July 24, 2014.[166] After reviewing and classifying Mr. Molina's past work as a delivery driver, the VE was asked several hypothetical questions by the ALJ.[167] First, the ALJ asked the VE to assume someone 43 years old (at onset) with a 12th-grade education (but without graduating) and with no sitting, standing, or walking limitations and restricted to lifting no more than 25 pounds frequently and 50 pounds occasionally, able to maintain complex instructions, but precluded from working with the general public or with no more than occasional contact with co-workers and no joint work as part of a team and limited contact with a supervisor, who would provide instructions for the day at the start of the shift (with only occasional contact thereafter).[168] The ALJ then asked if such a person could perform Mr. Molina's past work as a delivery driver.[169] The VE responded that such a person could not work as delivery driver because there would be too much contact with the public.[170] Second, the ALJ asked if someone with those attributes would be able to work in other jobs in the economy at large.[171] The VE said that such a person would be employable and gave as examples janitorial, industrial cleaner, and warehouse order picker jobs.[172] The ALJ then asked a second hypothetical question: assuming the same limitations above, but adding three additional limitations: "moderate [defined "as being 10 percent off task in each" category] difficulty in the ability to maintain adequate attention/concentration, moderate difficulty with the ability to withstand the stress of a routine workday, moderate limit in the ability to maintain emotional stability, predictability," would there be any jobs available for such a person.[173] The VE opined

---

[166] AR 58–63.

[167] AR 59–62.

[168] AR 60.

[169] AR 61.

[170] *Id.*

[171] *Id.*

[172] AR 61–62.

[173] AR 62.

that while it might be different if there were just one or two of these additional limitations, the cumulative effect of all three additional limitations would preclude all work.[174]

### 2.5 Administrative Findings

The ALJ held that Mr. Molina was not disabled within the meaning of the Social Security Act.[175] The ALJ observed that the Commissioner has established a sequential five-step evaluation process to determine if an individual is disabled.[176] At step one, the ALJ must determine whether the individual is engaging in "substantial gainful activity."[177] At step two, the ALJ must determine whether the individual has a "medically determinable impairment" that is "severe" or a combination of impairments that is "severe."[178] At step three, the ALJ must determine whether the individual's impairments are severe enough to meet a "listed" impairment.[179] At step four, the ALJ must determine the individual's "residual functional capacity" (RFC) and determine whether the individual can perform "past relevant work."[180] At step five, the ALJ must determine whether the individual can perform any other work.[181]

At step one, the ALJ found that that Mr. Molina had not engaged in substantial gainful activity since March 22, 2012, the alleged onset date.[182]

At step two, the ALJ found that Mr. Molina had the following severe impairments: "post-traumatic stress disorder; anxiety disorder; personality disorder; and history of hiatal hernia status

---

[174] AR 63.

[175] *See* AR 10–29.

[176] AR 19–21.

[177] AR 20.

[178] *Id.*

[179] *Id.*

[180] *Id.*

[181] AR 21.

[182] *Id.*

post repairs . . . because they cause more than a minimal effect on [Mr. Molina's] ability to perform basic work activities."[183]

At step three, the ALJ found that Mr. Molina did not have an impairment or combination of impairments that met or medically equaled the severity requirements for any listed impairment impairments described in "paragraph B" of the regulations.[184] Specifically, the ALJ found that Mr. Molina did not have "at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme."[185] The ALJ assessed the evidence on each of these dimensions and found that Mr. Molina had no restrictions on his daily living activities, moderate limitations in his social functioning, no difficulties with his concentration, persistence, or pace and that there was no evidence of episodes of decompensation (the ALJ also found that he did not meet the "paragraph C" criteria either).[186]

At step four, the ALJ reviewed and assessed the medical and other evidence and determined that Mr. Molina had the "residual functional capacity [(RFC)] to perform medium work as defined in 20 CFR 416.967(c) except he is precluded from working with the general public; and is precluded from working with coworkers as part of a team to produce a product or complete a task."[187]

At step five, the ALJ determined, based on the VE's testimony, that Mr. Molina did not have the RFC to perform his past relevant work, as a sales route truck driver, because of its necessary contact with the public.[188] The ALJ concluded, however, that considering Mr. Molina's "age [at the time of the alleged disability onset], education, work experience, and [RFC], there are jobs that

_____

[183] Id.

[184] See AR 21–23.

[185] Id.

[186] Id.

[187] AR 23–27.

[188] AR 27.

exist in significant numbers in the national economy that the claimant can perform," and therefore he was "not disabled."[189] Mr. Molina has timely appealed for review of the ALJ's decision.[190]

## ANALYSIS

### 1. Standard of Review

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review final decisions of the Commissioner. District courts may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotations omitted); 42 U.S.C. § 405(g). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (internal quotations and citations omitted). The substantial evidence must be "more than a mere scintilla but less than a preponderance." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *See Andrews*, 53 F.3d at 1039–40; *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997) ("'[W]here the evidence is susceptible to more than one rational interpretation,' we must uphold the Commissioner's decision.") (quoting *Andrews*, 53 F.3d at 1039–40) (alteration in original); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (if evidence supports more than one rational interpretation, the reviewing court may not substitute its judgment for that of the Commissioner); "Finally, we may not reverse an ALJ's decision on account of an error that is harmless." *Molina*, 674 F.3d at 1111.

---

[189] AR 28–29.

[190] *See* Compl. – ECF No. 1.

## 2. Applicable Law

An SSI claimant is considered disabled if he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A), (B).

The Commissioner uses a five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520. The five steps are as follows:

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

> **Step Four.** Considering the claimant's residual functional capacity ("RFC"), is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

> **Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2. *See* 20 C.F.R. § 404.1520(a)(4)(v).

For steps one through four, the burden of proof is on the claimant. *Tackett*, 180 F.3d at 1098; *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004) (claimant bears "the burden of proving an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment") (internal quotations omitted). At step five, the burden shifts to the Commissioner to show that the claimant can do other kinds of work. *Tackett*, 180 F.3d at 1098.

### 3. Application

In his motion for summary judgment, Mr. Molina alleges that the ALJ erred by (1) failing to properly evaluate and weigh the medical-opinion evidence,[191] (2) failing to properly evaluate and weigh Mr. Molina's testimony,[192] (3) failing to find that Mr. Molina's impairments met the listing criteria,[193] and (4) failing to specifically consider all Mr. Molina's limitations in her RFC findings.[194]

### 3.1 The ALJ Adequately Evaluated & Weighed the Medical-Opinion Evidence

The ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews*, 53 F.3d at 1039). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20

---

[191] Motion for Summary Judgment – ECF No. 17 at 6, 8–14 (on appeal, Mr. Molina's allegation is that he is disabled due to his PTSD and other mental impairments; he does not challenge the ALJ's rejection of his disability claim based on his physical impairments or on the ALJ's failure to properly consider the cumulative impact of his physical and mental impairments).

[192] *Id.* at 6, 14–15.

[193] *Id.* at 6, 15–17. On appeal, the gravamen of Mr. Molina's claim that the ALJ erred in finding that Mr. Molina's impairments did not meet the listing criteria is based upon his contention that the ALJ failed to give sufficient weight and import to certain medical opinions, notably the opinions of his treating physician, Dr. Kayman, and one of his examining physicians, Dr. Wiebe. Because the court concludes that the ALJ's evaluation and weighing of the medical evidence is based on specific and legitimate reasons supported by substantial evidence, the court finds this claim to be without merit and does not otherwise address it separately in this order.

[194] *Id.* at 6, 17–18.

C.F.R. § 416.927(b); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotations omitted)).

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). Social Security regulations distinguish between three types of physicians (and other "acceptable medical sources"): (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). An ALJ, however, may disregard the opinion of a treating physician, whether or not controverted. *Andrews*, 53 F.3d at 1041. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (alteration in original) (internal quotations omitted). By contrast, if the ALJ finds that the opinion of a treating physician is contradicted, a reviewing court will only require that the ALJ provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotations omitted); *see also Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (internal quotations omitted). "If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (quoting 20 C.F.R.

§ 404.1527(d)(2)(i)–(ii)) (alteration in original). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[, and] the specialty of the physician providing the opinion . . . ." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)–(6)); *see also Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) (ALJ need not agree with everything contained in the medical opinion and can consider some portions less significant than others).

### 3.1.1 Medical Opinion Evidence — Physical Impairments

Dr. Rana examined Mr. Molina at the request of the State agency to assess his physical impairments, including his reported right shoulder pain and history of hiatal hernia post-surgical repairs.[195] Dr. Rana found that Mr. Molina had no "sitting, standing or walking limitations" and that he could "carry 25 pounds frequently and 50 pounds occasionally."[196] Mr. Molina's physical impairments were reviewed by a non-examining physician who concurred, giving "great weight" to Dr. Rana's assessment, finding it consistent with Mr. Molina's medical records.[197] The ALJ incorporated these limitations into the hypotheticals given to the VE and into her decision.[198] On appeal, Mr. Molina does not contest these findings or contend that he is disabled as a result of his physical impairments or that the ALJ failed to properly consider the cumulative impact of his physical and mental impairments.

### 3.1.2 Medical Opinion Evidence — Mental Health Impairments

The "acceptable medical source" evidence relating to Mr. Molina's mental-health impairments includes the following: (i) the medical opinion and treatment records of Mr. Molina's treating

---

[195] AR 289–91.

[196] AR 291.

[197] AR 86; *see generally* AR 79–90.

[198] *See* AR 60, 26.

psychiatrist, Dr. Kayman,[199] (ii) the medical opinion and test/evaluation of the three psychological examinations conducted by Dr. Bodepudi,[200] Dr. Spivey,[201] and Dr. Wiebe,[202] and (iii) a non-examining review by Dr. Jacobson.[203]

The ALJ made various credibility determinations on the conflicting medical opinion evidence regarding Mr. Molina's mental health impairments.[204] *See Batson*, 359 F.3d at 1195 ("When presented with conflicting medical opinions, the ALJ must determine credibility and resolve the conflict.") (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)). Here, because the medical evidence is contradictory, this court reviews the ALJ's finding to determine whether the ALJ provided "specific and legitimate reasons supported by substantial evidence in the record" for crediting or discrediting each medical opinion, and to ensure that the ALJ's findings are consistent with the record as a whole. *See Reddick*, 157 F.3d at 725; *Vasquez*, 572 F.3d at 591; *see also Ryan*, 528 F.3d at 1198; *Garrison*, 759 F.3d at 1012 (ALJ is responsible for resolving conflicting in medical testimony based on specific and legitimate reasons); *Andrews*, 53 F.3d at 1039–40 (noting that a reviewing court will defer to ALJ's decision if there is "substantial evidence").

### 3.1.2.1 Medical Opinion Evidence — Dr. Kayman: Treating Physician

Dr. Kayman, Mr. Molina's treating physician, saw Mr. Molina for four sessions between February 2012 and July 2012, diagnosing Mr. Molina with PTSD.[205] After a gap of almost two years, Dr. Kayman saw Mr. Molina one more time in late June 2014.[206] During the 2014 examination, Dr. Kayman found that Mr. Molina's condition had "significantly worse[ned]" and wrote in a letter that Mr. Molina "continues to be disabled and unable to work due to his mental

---

[199] AR 277–82, 351–56.

[200] AR 292–95.

[201] AR 317–24.

[202] AR 332–50.

[203] AR 79–90.

[204] *See* AR 24–27.

[205] AR 277–82.

[206] *See id.* (2012 treatment records) & AR 351(noting Mr. Molina's return in June 2014).

illness."[207] Dr. Kayman also subsequently completed a mental-impairment questionnaire, finding that Mr. Molina had "marked" or "extreme" mental impairments in 10 of the 14 categories contained in the questionnaire and finding that those impairments would interfere with Mr. Molina concentration or pace of work for 50% of the work day and would cause him, on average, to miss more than 4 days per month.[208]

In her decision denying disability based on Mr. Molina's RFC, the ALJ gave "no weight" to Dr. Kayman's opinion as to the severity of Mr. Molina's mental impairments, finding that "Dr. Kayman's opinion overstates [Mr. Molina's] impairment and is unsupported by the record as a whole."[209] Specifically, the ALJ found that Dr. Kayman's "own treatment notes do not support the level of limitation he opined" and that his opinion was not supported by (i) Mr. Molina's history of limited mental-health treatment, (ii) his daily living activities, and (iii) the psychological evaluations of Mr. Molina by the three examining doctors.[210]

On appeal, Mr. Molina contends that ALJ erred by not giving weight to Dr. Kayman's opinion as the treating physician.[211] This court disagrees and will review each of the ALJ's reasons.

First, a "conflict between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician." *See Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014); *Molina*, 674 F.3d at 1111–12 (conflict between treatment record and report by treating physician's assistant was basis for discrediting the report); *Valentine v. Comm'r*

---

[207] AR 351. The ALJ properly disregarded Dr. Kayman's "disability" conclusion. The issue of "whether a claimant is disabled" is "reserved to the Commissioner." *Allen v. Comm'r of Soc. Sec.*, 498 F. App'x 696, 696 (9th Cir. 2012) (citing 20 C.F.R. §§ 404.1527(d)(1)–(2), 416.927(d)(1)–(2)). "A treating source's opinion on issues reserved to the Commissioner can never be entitled to controlling weight or given special significance." *Id.* (citing SSR 96-5p, 1996 WL 374183 *5); 20 C.F.R. § 416.927(d)(1) (the Social Security Administration ("SSA") is "responsible for making the determination or decision about . . . disability . . . . A statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that [the SSA] will determine that [the claimant is] disabled.").

[208] AR 352–53.

[209] AR 26–27.

[210] AR 27.

[211] Motion for Summary Judgment – ECF No. 17 at 6, 8–11.

*of Soc. Sec. Admin.*, 574 F.3d 685, 692–93 (9th Cir. 2009) (conflict with treatment notes is a specific and legitimate reason to reject treating physician's opinion); *Costa v. Comm'r of Soc. Sec.*, 525 F. App'x 640, 641 (9th Cir. 2013) (inconsistencies between the physician's opinion and previous treatment records provided sufficient reasons for not crediting the physician's conclusions); *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (holding that even under the "clear and convincing" standard, the ALJ properly discredited a treating physician's opinion when it was not supported by the physician's own clinical notes); *Batson*, 359 F.3d at 1193, 1195 (noting that the claimant bears the burden of proof of disability and affirming ALJ's rejection of contradicted medical opinion because it was conclusory and not supported by objective evidence); *Meanel v. Apfel*, 172 F.3d 1111, 1113–14 (9th Cir. 1999) (affirming an ALJ's discrediting of a treating physician's conclusory and minimally supported medical opinion); *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (upholding the ALJ's decision to reject an examining medical provider's assessment which conflicted with the provider's own medical reports and testing).

Here, Dr. Kayman's treatment notes reflect that he initially saw Mr. Molina for marital difficulties, but ultimately diagnosed him with PTSD.[212] Dr. Kayman's treatment notes also indicate that Mr. Molina had never been hospitalized for any psychiatric condition — though Mr. Molina reported having seen a psychiatrist 15 years earlier and having taken Zoloft while in prison.[213] Mr. Molina also reported a history of gang-related activity and incarceration and that as a result of his prior gang affiliation, he was now fearful, sleeps poorly, has nightmares and flashbacks, and avoids crowds.[214] As part of his treatment plan, Dr. Kayman prescribed Zoloft at 25 mg daily with a goal of 200 mg daily, anger-management counseling with a social worker, and a follow-up session in four weeks (when they would start Mr. Molina on Prazosin for the nightmares).[215] It does not appear from the record that Mr. Molina ever sought or undertook any anger-management counseling as prescribed by Dr. Kayman. At their second session, Dr. Kayman

---

[212] AR 280.

[213] *Id.*

[214] *Id.*

[215] AR 281–82; *see also* AR 278 (noting use of Prazosin to address "nightmares").

noted that Mr. Molina "[f]elt a little more relaxed," had "[n]o complaints" and was "doing better but still has sleep problems."[216] Dr. Kayman increased his Zoloft to 50 mg per day and started him on Prazosin.[217] Dr. Kayman gave Mr. Molina a GAF rating of 55.[218] At the third session, Dr. Kayman noted that Mr. Molina was "sleeping better" and had "[n]o nightmares" — though his spouse reported him still "yelling" in his sleep.[219] Dr. Kayman maintained his Zoloft dosage at 50 mg, despite having previously set a dosage "goal" of 200 mg per day[220] and modified his Prazosin to address the "nightmares" and extended the interval for the follow-up sessions from four week intervals to six-to-eight week intervals.[221]

In his fourth and final 2012 session, Mr. Molina reported that he had "left [his] welfare program when he felt disrespected" and lost the related financial support.[222] As a result, his spouse and children were moving in with her family in Oakland (with whom Mr. Molina did not get along) and he was going to live with an aunt in Stockton.[223] Dr. Kayman maintained the Zoloft dosage and restarted the Prazosin, which Mr. Molina had stopped, and maintained the follow-up interval at six-to-eight weeks.[224] Thereafter, however, it appears that Mr. Molina did not seek or receive any additional mental health treatment until he returned to Dr. Kayman in late June 2014, shortly before his ALJ hearing in July 2014.[225]

---

[216] AR 279.

[217] *Id.*

[218] *Id.*; *see also Garrison*, 759 F.3d at 1002 n.4 (noting a rating in this range indicates a "moderate difficulty in social, occupational, or school functioning"); *see also McFarland v. Astrue*, 288 F. App'x 357, 359 (9th Cir. 2008) ("The Commissioner has determined the GAF scale does not have a direct correlation to the severity requirements in [the Social Security Administration's] mental disorders listings.") (internal quotations and citation omitted) (alteration in original).

[219] AR 278.

[220] *See* AR 278, 281.

[221] *Id.*

[222] AR 277.

[223] *Id.*; AR 333 (noting that his spouse's parent's house was in Oakland)

[224] AR 277.

[225] *See* AR 351; AR 34 (noting AJ hearing date of July 24, 2014).

Given these treatment notes, substantial evidence supports the ALJ's finding that Dr. Kayman's opinions regarding the severity of Mr. Molina's mental impairments, made after his one-time examination of Mr. Molina in 2014, are not supported by his own treatment records.[226] *See Ghanim*, 763 F.3d at 1161 ("[C]onflict between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician . . . ."); *Molina*, 674 F.3d at 1111–12; *Costa*, 525 F. App'x at 641; *Bayliss*, 427 F.3d at 1216.[227]

Second, substantial evidence supports the ALJ's determination that Mr. Molina's history of "limited mental health treatment" was not consistent with the alleged severity of his impairments reported by Dr. Kayman.[228] A claimant's lack of treatment can be evidence of the lack of severity of such claimant's reported symptoms. *See Molina*, 674 F.3d at 1113–14 ("failure to seek treatment or to follow a prescribed course of treatment" can be legitimate reasons for disregarding a treating or examining physician's opinion) (internal quotations omitted); *Orn*, 495 F.3d at 636. As noted above, the record indicates that Mr. Molina was seen only four times between February 2012 and July 2012 and once in June 2014.[229] While the Ninth Circuit has cautioned that in the area of mental health, the fact that a claimant "may have failed to seek psychiatric treatment for his mental condition" should not be used to "chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation," *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th

---

[226] *See* AR 27 (in her decision, the ALJ found that Dr. Kayman's "one-time" June 2014 observation of Mr. Molina's deteriorating condition was insufficient to establish Mr. Molina's disability as of March 22, 2012; the ALJ highlighted, however, that to the extent Mr. Molina's mental impairments had worsened in "*2014, and his mental health providers document a continuation of that worsening, it certainly may serve as the basis for a new application*") (emphasis in the original)).

[227] On appeal, Mr. Molina also contends that the ALJ improperly relied upon Dr. Kayman's treatment notes because the primary purpose of such treatment notes is to "'promote communication and recordkeeping for health care personnel — not to provide evidence for disability determinations.'" Motion for Summary Judgment – ECF No. 17 at 10 (quoting *Orn*, 495 F.3d at 634). Here, however, unlike in *Orn*, the record "viewed in its entirety" does not "provide[] ample support" for the treating physician's opinion, particularly given Mr. Molina's limited mental-health treatment history. *Cf. Orn*, 495 F.3d at 634.

[228] AR 27.

[229] *See* AR 277–82, 355–56; *see also* AR 26 (despite the limited number of sessions, the ALJ considered Dr. Kayman as Mr. Molina's "treating psychiatrist"); *accord Le v. Astrue*, 529 F.3d 1200, 1201–02 (9th Cir. 2008) (an attorney's fees case; noted that the court in the underlying substantive disability case found that a doctor who treated the claimant "five times in three years for treatment of severe psychological problems" was a treating physician).

Cir. 1996) (internal quotations omitted), the record as a whole does not support the position that Mr. Molina's mental impairments were such that they preclude or prevented his ability to seek treatment. From his treatment record, there is no indication of any issue with Mr. Molina's attending scheduled medical treatment or evaluation appointments, or with his non-cooperativeness at such appointments due to his mental-health impairments.[230] While Mr. Molina's reported relocation to Stockton after July 2012 may account for the treatment gap from July 2012 to June 2014, Dr. Kayman's 2012 medical records also indicate that his treatment and prescribed medication had improved Mr. Molina's PTSD symptoms and by December 2013, Mr. Molina reported to Dr. Wiebe that he was living back in Oakland.[231] In addition, as part of his treatment history, it does not appear that Mr. Molina always took his prescribed medication,[232] nor does it appear that he sought or received any follow-up treatment after his one-time examination by Dr. Kayman in June 2014 (or after his examination with Dr. Wiebe, who recommended "comprehensive psychological treatment").[233] Given these circumstances, the ALJ did not err by finding that Mr. Molina's sporadic and limited mental-health treatment was inconsistent with the severity of Mr. Molina's mental impairments reported by Dr. Kayman. *See Andrews*, 53 F.3d at 1039–40; *see also Molina*, 674 F.3d at 1113–14.

Third, substantial evidence supports the ALJ's finding that Mr. Molina's daily living activities did not support the severity of impairment opined by Dr. Kayman.[234] Specifically, other than his reported anxiety "being around large crowds" or in uncontrolled public places, Mr. Molina has repeatedly indicated that "[h]e is able to do everything that is needed in daily activities" including

---

[230] *See, e.g.*, AR 277–81.

[231] *See* AR 278, 279; AR 333 (as of the date of his examination with Dr. Wiebe, in December 2013, Mr. Molina reported that he was living with his spouse and children at his in-laws' house in Oakland). Likewise, nothing in the record indicates that Mr. Molina could not have sought mental health treatment while residing in Stockton.

[232] *See, e.g.*, AR 277, 46.

[233] *See* AR 24 (ALJ noting that "there is no indication" that Mr. Molina sought further treatment after seeing Dr. Kayman in June 2014); AR 347 (Dr. Wiebe's December 2013 recommendation for further psychological treatment).

[234] AR 27; AR 21–22.

household chores, preparing meals, watching TV, caring for himself and his children and sometimes taking them places, driving, visiting with friends and family.[235] *Molina*, 674 F.3d at 1112–13 (in the context of discrediting a claimant's testimony, the court found that "when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting . . . [e]ven where those activities suggest some difficulty functioning, they may be grounds for discrediting" claims of disability); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600–02 (9th Cir. 1999) (inconsistency between a treating physician's opinion and a claimant's daily activities considered a specific and legitimate reason to discount the treating physician's opinion); *see also Ghanim*, 763 F.3d at 1162 (acknowledging that discrepancies between a claimant's daily living activities and a treatment provider's assessment of the severity of the claimant's impairments "may justify rejecting a treating provider's opinion," but nevertheless finding that "a holistic review of the record does not reveal an inconsistency between the treating providers' opinions and [claimant's] daily activities").

Here, the ALJ's finding — that Dr. Kayman's opinion regarding the severity of Mr. Molina's impairments was inconsistent with Mr. Molina's reported daily living activities — provided a specific and legitimate basis to reject Dr. Kayman's opinion and is supported by substantial evidence based on the record as a whole. *See Morgan*, 169 F.3d at 600; *see also Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989).

Fourth, the ALJ found that Dr. Kayman's 2014 medical opinions were not supported by the non-treating, psychological examinations by Drs. Bodepudi, Spivey, and Wiebe.[236] The court considers each individually. Because the issue of whether these examinations support the ALJ's finding turns, in part, on the degree to which the ALJ credited all or part of these medical

---

[235] *See* AR 293–94; *see also* AR 224–31 (self-reported daily activities and abilities, including dressing, meal preparation, household chores, watching TV, etc.); AR 318 (reporting that Mr. Molina "can drive," "can live alone," "manage bank accounts," "clean the house and do laundry," "go to the store," and "sometimes takes care of his children and takes them places"); AR 281 (Mr. Molina reported that he "[t]akes care of [the] kids" while his spouse works and goes to school); AR 294 (visiting friends and family); *but see* AR 341 (noting that he tries to "avoid[] going to stores" or to do so "very quickly" to avoid people); AR 227 (noting that he "rarely" shops); AR 230 (noting his fear of "being around large crowds").

[236] AR 26–27.

opinions, the court also considers whether the ALJ erred in its determination of the proper weight to give to each of these medical opinions.

### 3.1.2.2 Medical Opinion Evidence — Dr. Bodepudi: Examining Physician

The ALJ gave "great weight" to Dr. Bodepudi's medical opinion.[237] Dr. Bodepudi examined Mr. Molina at the request of the State agency in August 2012.[238] Dr. Bodepudi noted that Mr. Molina's chief complaints were "PTSD and Stress."[239] Dr. Bodepudi reported that Mr. Molina "states that [his] sleep, energy, appetite and weight are okay and [his] mood swings are between normal and sad."[240] Dr. Bodepudi found that Mr. Molina was mostly cooperative and that his mood/affect was "[a]ppropriate," his speech was normal in "rate, tone and volume" and that "[h]e was able to converse OK at times he was argumentative."[241] Dr. Bodepudi reported that Mr. Molina's thought process was "[g]oal directed" and his intellectual functioning was "[a]verage to high average."[242] Mr. Molina was able to do "[c]alculations" with "ease," and Dr. Bodepudi found Mr. Molina to be cognitively alert, and reported that Mr. Molina had "Excellent" functioning across multiple assessment criteria, including in the areas of "Fund of Knowledge," "Similarities / Differences," "Concentration," "Abstraction," and "Insight/Judgment."[243] Dr. Bodepudi diagnosed Mr. Molina, who acknowledged using marijuana, with "[c]annabis induced mood disorder" and ruled out a mood-disorder due to "general medical condition" and assigned him a GAF of 70 and a "fair" prognosis.[244] Functionally, Dr. Bodepudi found that Mr. Molina "is able to [do] everything that is needed in daily activities,"[245] and had "no impairment to perform work activities on a

---

[237] AR 26.

[238] AR 292–95.

[239] AR 292.

[240] AR 293.

[241] AR 294.

[242] *Id.*

[243] *Id.*

[244] AR 295.

[245] AR 293–94.

consistent basis" and "no impairment to understand/remember/complete" simple or complex instructions, but found "moderate impairment to interact appropriately with supervisors/coworkers/public" based on his history of "slapping his boss."[246]

In giving "great weight" to Dr. Bodepudi's examination results, the ALJ found the report "well supported" by the record as a whole and by Dr. Bodepudi's own examination and the examination results by Dr. Spivey.[247] Given Dr. Bodepudi's status as an "acceptable medical source," the contents of the examination report, and the medical record as a whole (including Mr. Molina's limited mental-health treatment history, Dr. Kayman's treatment notes, Dr. Spivey's testing results), the court finds that substantial evidence supports the ALJ's determination that Dr. Bodepudi's medical opinion provided an additional specific and legitimate basis upon which the ALJ discredited Dr. Kayman's subsequent, and contradictory, evaluation in 2014 of the severity of Mr. Molina's mental health impairments.[248] *See Garrison*, 759 F.3d at 1010, 1012 (ALJ is responsible for resolving conflicting in medical testimony based on specific and legitimate reasons supported by substantial evidence); *Andrews*, 53 F.3d at 1039–40 (noting that reviewing court will defer to ALJ's decision if there is "substantial evidence").

### 3.1.2.3 Medical Opinion Evidence — Dr. Spivey: Examining Physician

In November 2013, Dr. Spivey examined Mr. Molina at the request of the State agency.[249] Dr. Spivey noted that Mr. Molina's chief complaint was "posttraumatic stress disorder."[250] Dr. Spivey reported that Mr. Molina was "alert," with a "neutral" mood and "appropriate" affect, but that he appeared to be "somewhat anxious," but was otherwise "generally cooperative."[251] Mr. Molina indicated that he was currently on Zoloft, but that he was not "in counseling" and that he had

---

[246] AR 295.

[247] AR 26.

[248] AR 27.

[249] AR 317–20.

[250] AR 317.

[251] AR 318

never been hospitalized for any psychiatric conditions.[252] Dr. Spivey found no limitation on his

daily activities or abilities.[253] She ran a series of tests on Mr. Molina and concluded that

"[c]ognitively [Mr. Molina] [was] well within normal limits," noting that "[t]here does not appear

to be any sign of a thought disorder," but that his fears of attack by gang members "do not appear

to be rational" and that his history and presentation was "suggestive of a personality disorder"

based on his acknowledged "anger" issues.[254] Dr. Spivey concluded that "[t]here [was] nothing

acute" in his condition.[255] Dr. Spivey's report also contained a section assessing Mr. Molina's

"Work-Related ABILITIES."[256] In that section, Dr. Spivey found no impairment in Mr. Molina's

ability to communicate verbally or in writing or to follow simple or complex instructions,[257] or

maintain adequate pace or persistence to complete simple tasks though potentially "[m]ild"

difficulties in his ability "to maintain adequate pace and persistence to complete complex tasks" or

"to adapt to changes in job routines."[258] Dr. Spivey's report did note "[m]oderate" impairments in

Mr. Molina's ability (1) "to maintain adequate attention/concentration," (2) "to withstand the

stress of a routine work day," and (3) "to maintain emotional stability/predictability."[259]

---

[252] AR 317.

[253] AR 318.

[254] AR 318–19.

[255] AR 319.

[256] *Id.*

[257] *Compare* AR 319, *with* AR 321 (Dr. Spivey's examination report found no impairment in her ability to "follow complex instructions," but in an attached questionnaire, she checked the box noting "moderate" restrictions in Mr. Molina's ability to "carry out complex instructions").

[258] AR 319.

[259] *Id.* In her examination report, Dr. Spivey does not define what constitutes a "moderate" impairment, but Dr. Spivey also completed and submitted an SSA approved form entitled "ABILITY TO DO WORK-RELATED ACTIVITES (MENTAL)" which defines "moderate" as "more than a slight limitation in [the respective area of impairment,] but the individual is still able to function satisfactorily." AR 321. By contrast, at the hearing, the ALJ defined "moderate," for the VE, as being "10 percent off task" in each of the relevant areas of impairment and that each impairment was cumulative. AR 62. Given these arguably inconsistent definitions, it is not clear whether the import that the ALJ ascribed to Dr. Spivey's medical opinion on these "moderate" impairments was warranted. Nevertheless, because the court finds that the ALJ supported her decision to give "little weight" to these findings of Dr. Spivey with "specific and legitimate reasons supported by substantial evidence," *see Reddick*, 157 F.3d at 725 (9th Cir. 1998), the court need not resolve this question.

The ALJ gave little weight to those portions of Dr. Spivey's report which found these three "moderate" difficulties, noting the absence of any reported "impairment in attention or concentration" in Dr. Spivey's examination and concluding that Dr. Spivey's findings "seem[ed] to have been largely based upon the claimant's self-report of his symptoms."[260] *See Magallanes*, 881 F.2d at 753 (ALJ need not agree with everything contained in the medical opinion).

Given Dr. Spivey's overall examination findings that Mr. Molina was cognitively "well within normal limits,"[261] the absence of any clinical finding that Mr. Molina suffered from any impairment in attention or concentration, and the findings by Drs. Bodepudi and Wiebe of "none" and "mild" impairments respectively in the area of concentration,[262] substantial evidence supports the ALJ's finding that Dr. Spivey's conclusions regarding Mr. Molina's "moderate" mental impairments relating to attention/concentration were entitled to "little weight."[263] Likewise, as outlined above, the ALJ's reliance on Mr. Molina's limited mental-health treatment history (and the limited nature of the impairments evidenced in Mr. Molina's treatment records with Dr. Kayman), and Dr. Spivey's apparent reliance on Mr. Molina's self-reported symptoms, which the ALJ did not find "entirely credible"[264] also constitute specific and legitimate reasons based upon substantial evidence to give little weight to those portions of Dr. Spivey's report. *See Orn*, 495 F.3d at 636 (limited treatment history can be basis for rejecting claimant's testimony); *Batson*, 359 F.3d at 1195 (affirming ALJ's rejection of contradicted medical opinion because it was conclusory and not supported by objective evidence); *Ghanim*, 763 F.3d at 1162 ("If a treating provider's opinions are based 'to a large extent' on an applicant's self-reports and not on clinical evidence,

---

[260] AR 26. Dr. Spivey also noted "[m]oderate" impairments in his ability "to interact appropriately with co-workers, supervisors and the public on a daily basis," which the ALJ did not contest or discredit. *See* AR 320.

[261] AR 319.

[262] Dr. Bodepudi found Mr. Molina's "concentration" to be "excellent," and Dr. Wiebe found only "mild limitations" in Mr. Molina's attention/concentration /persistence. AR 294, 337–38. In his examination with Dr. Wiebe, Mr. Molina denied having any trouble concentrating, reporting that he was a "planner" and sometimes "concentrate[s] too much." AR 341.

[263] AR 26.

[264] AR 24; *see also infra* Section 3.2 (for discussion of ALJ credibility determination of Mr. Molina's statements).

and the ALJ finds the applicant not credible, the ALJ may discount the treating provider's opinion.") (quoting *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *see also Andrews*, 53 F.3d at 1039–40 (if the record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision); *Ghanim*, 763 F.3d at 1159–60 ("'Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record.'") (quoting *Molina*, 674 F.3d at 1111).

### 3.1.2.4  Medical Opinion Evidence — Dr. Wiebe: Examining Physician

In December 2013, at the request of Mr. Molina's attorney, Dr. Wiebe examined Mr. Molina and performed various psychological tests.[265]

Dr. Wiebe ruled out a variety of disorders, but diagnosed Mr. Molina with severe PTSD and severe major depressive disorder, assessing that "the combination of Mr. Molina's psychiatric, cognitive, and social functioning problems will make him likely unable to work in a full time job for at least two years" and recommending "comprehensive psychological treatment and social support."[266] Specifically, Dr. Wiebe found that "Mr. Molina experiences psychiatric symptoms including frequent nightmares, flashbacks, paranoia, anger reactivity, insomnia, depression, anxiety, irritability, and fatigue."[267] It does not appear, however, that Mr. Molina subsequently sought any treatment for these conditions until his one-time examination with Dr. Kayman in June 2014, despite his apparent return to Oakland by December 2013.[268]

The ALJ gave "little weight" to Dr. Wiebe's opinion, finding that Dr. Wiebe's own assessments "showed only mild impairment in attention, concentration and pace and sensory-motor functioning, and executive [functioning], language and overall intellectual functioning

---

[265] AR 332–50.

[266] AR 347.

[267] AR 346.

[268] *See* AR 333 (at the time of his examination, Mr. Molina reported he was living in the Oakland area, where his treating physician practices); *see* AR 351 (June 2014 examination).

within normal range," which were not consistent with Dr. Wiebe's overall findings.[269] For example, while Dr. Wiebe specifically found that Mr. Molina's test results evidenced only "mild impairment" in the areas of "Attention/Concentration/Persistence," she opined in her "Conclusions" that "Mr. Molina would have difficulties sustaining attention, pace, and persistence."[270] The ALJ also found that Mr. Molina's "limited mental health treatment also does not support Dr. Wiebe's assessment."[271]

Here, given Dr. Wiebe's test findings, Mr. Molina's limited mental-health treatment history, and the presence of contradictory medical opinions in the record, the court finds that the ALJ provided sufficient reasons supported by substantial evidence to give little weight to Dr. Wiebe's opinion. *See Andrews*, 53 F.3d at 1039 (substantial evidence is "more than a mere scintilla"); *Molina*, 674 F.3d at 1113–14 (inconsistent or lack of treatment can be legitimate basis for discrediting the purported severity of an impairment); *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008) ("ALJ is responsible for resolving conflicts in the medical record."); *see also Tackett*, 180 F.3d at 1097–98 (if evidence supports more than one rational interpretation, the reviewing court may not substitute its judgment for that of the Commissioner).

### 3.1.2.5  Medical Opinion Evidence — Dr. Jacobson: Non-Examining Physician

Finally, the ALJ gave "great weigh[t] to the extent it is consistent with [the ALJ's] decision" to the opinion of Dr. Jacobson, the non-examining physician who opined on Mr. Molina's mental impairments, because his decision was consistent with the record as a whole.[272] "The opinions of

---

[269] AR 26; *see also* AR 332–50 (Dr. Wiebe's report – "Cognitive Functioning," as measured by IQ, was "likely in the average to above average" range (AR 337), his "Attention/Persistence/Concentration showed only "mild impairment" (AR 337–38), his "Executive Functioning," "which entails the ability to plan, sequence, abstract, and organize," was "normal" (AR 338), his "Memory" was assessed as "moderately to severely impaired" (AR 338), his "Language" functioning was "normal" (AR 338–39), his "Visual/Spatial Abilities" were "mildly impaired" as was his "Sensory/Motor Abilities" based on his being tired and his self-report of being easily fatigued (AR 339)).

[270] *Compare* AR 337–38, *with* AR 346. Dr. Wiebe did caveat her findings in this category by noting that Mr. Molina's ability to perform on the test in a clinical setting did not necessarily mean that he also could do so in a work setting. *See* AR 338.

[271] AR 26.

[272] *Id.*

non-treating or non-examining physicians may . . . serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Morgan*, 169 F.3d at 600 (opinion of a non-examining physician can be "substantial evidence" if it is consistent with and "supported by other evidence in the record"); *Andrews*, 53 F.3d at 1041.

Here, Dr. Jacobson — based on his review of Mr. Molina's medical record, including Dr. Kayman and Dr. Bodepudi's evaluations — determined that Mr. Molina had no limitation in his understanding and memory and was able to "maintain complex instructions" during a 40-hour workweek, but did have "moderate" social interaction limitations with the public, co-workers, and supervisors (but that his anger and irritation issues did not preclude such interactions).[273] Given that Dr. Jacobson's opinion was consistent with Dr. Bodepudi's findings and supported by other evidence in the record, the ALJ was entitled to treat Dr. Jacobson' opinion as substantial evidence. *See Thomas*, 278 F.3d at 957; *Morgan*, 169 F.3d at 600.

In sum, the court finds that the ALJ provided specific and legitimate reasons supported by substantial evidence in the record in his evaluation and weighing of all the various medical opinion evidence. As such, the court finds no error by the ALJ in this area. *See Andrews*, 53 F.3d at 1039–40; *Tackett*, 180 F.3d at 1097–98 (if the evidence supports more than one rational interpretation, the reviewing court may not substitute its judgment for that of the Commissioner).

### 3.2 Mr. Molina's Testimony

In her decision, the ALJ recapped Mr. Molina's testimony and statements regarding his history of incarceration and past gang activity and his current fears related to those past activities.[274] The ALJ also noted Mr. Molina's testimony "that he gets defensive, irritated and distracted" and that he "avoids leaving the house."[275] The ALJ found Mr. Molina's testimony and other statements

---

[273] AR 87–88; *see also* AR 86 (where Dr. Jacobson gave "great weight" to Dr. Bodepudi's evaluation of Mr. Molina ).

[274] AR 23; *see also* AR 40–42 (Mr. Molina's testimony regarding his gang and prison activity).

[275] AR 23–24; *see also* AR 40–42, 45 (Mr. Molina's testimony regarding his defensiveness, irritability, and distractibility).

"concerning the intensity, persistence and limiting effects" of his mental and physical impairments to be "not entirely credible" because of (i) his "lack of ongoing mental health treatment," (ii) the three "psychological examinations" with Drs. Bodepudi, Spivey, and Wiebe, which while supportive of a finding that Mr. Molina has PTSD and anxiety / personality disorders, did not demonstrate — along with the other "medical evidence" — that Mr. Molina's mental impairments cause "an inability to perform all work," and (iii) his "reported [daily living] activities [which] suggest an ability to perform a limited range of work."[276]

In assessing a claimant's credibility, an ALJ must make two determinations. *Molina*, 674 F.3d at 1112. "'First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison*, 759 F.3d at 1014 (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007)) (internal quotations omitted). Second, if the claimant has produced that evidence, and "there is no evidence of malingering," the ALJ must provide "specific, clear and convincing reasons for" rejecting the claimant's testimony regarding the severity of the claimant's symptoms. *Id.* at 1014–15 (quoting *Smolen*, 80 F.3d at 1281). "At the same time, the ALJ is not 'required to believe every allegation of disabling [condition], or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" *Molina*, 674 F.3d at 1112 (quoting *Fair*, 885 F.2d at 603).

Moreover, in order to have meaningful appellate review, "the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas*, 278 F.3d at 958 (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345–46 (9th Cir. 1991) (en banc)). Moreover, the court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010. "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately

---

[276] AR 24–25.

explained, failure to seek treatment or follow a prescribed course of treatment." *Orn*, 495 F.3d at 636 (internal quotation marks omitted).

Here, the ALJ found that Mr. Molina's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" and did not find that he was malingering.[277] As such, the ALJ must provide "specific, clear and convincing reasons for" rejecting Mr. Molina's testimony regarding the severity of his symptoms. *Garrison*, 759 F.3d at 1014–15.

The ALJ's first reason for finding Mr. Molina's testimony "not entirely credible" was his limited record of mental-health treatment.[278] The ALJ specifically noted that while Mr. Molina had been diagnosed with PTSD and related symptoms, he had (since leaving prison roughly 15 years ago) "received mental health treatment" for only approximately six months in 2012 and that thereafter there was no evidence of treatment until June 2014, when Mr. Molina returned one time to his treating physician, Dr. Kayman.[279] The ALJ also noted that even though Dr. Kayman had found that Mr. Molina's "condition had worsened" since 2012, "there is no indication of further treatment thereafter."[280]

The "failure to seek treatment" is a legitimate factor "in weighing a claimant's credibility." *See Orn*, 495 F.3d at 636; *Molina*, 674 F.3d at 1113 (in assessing the claimant's credibility, the ALJ may properly rely on "'unexplained or inadequately explained failure to seek treatment'") (quoting *Tommasetti*, 533 F.3d at 1039); *Fair*, 885 F.2d at 603.

As discussed above, the Ninth Circuit has cautioned that the ALJ (and the reviewing court) should consider whether such failure is the result of underlying mental-health issues. *See Nguyen*, 100 F.3d at 1465. The record, however, does not support the position that Mr. Molina's mental impairments were such that they preclude or prevented his ability to seek treatment; as such, the court finds that Mr. Molina's limited treatment history provides a "specific, clear, and convincing reason[]" for the ALJ to reject his testimony. *See Molina*, 674 F.3d at 1113; *Orn*, 495 F.3d at 636.

---

[277] AR 24; *see also* AR 19–29 (ALJ decision with no finding of malingering).

[278] AR 24.

[279] *Id.*; *see also* AR 45 (Mr. Molina's testimony that he has been "out 15 years").

[280] AR 24.

1    The ALJ's second reason for discounting Mr. Molina's testimony was the inconsistency

2    between Mr. Molina's statements on the "intensity, persistence and limiting effects" of his mental

3    impairments and the three psychological examinations by Drs. Bodepudi, Spivey, and Wiebe and

4    the "medical evidence" as a whole.[281] An ALJ's finding that a claimant's testimony regarding the

5    severity and limiting effect of their impairments is "inconsistent" with the "medical evidence in

6    the record" can provide "specific, clear, and convincing reasons" for an "adverse credibility

7    determination." *See Molina*, 674 F.3d at 1112–13.

8        Here, again, the ALJ properly evaluated and weighed the medical evidence in the record and

9    provided legitimate and specific reasons supported by substantial evidence for finding that while

10   Mr. Molina suffers from PTSD and other mental impairments, these impairments did not "cause

11   an inability to perform all work."[282] Given these circumstances, the court also finds that these

12   reasons provided "specific, clear, and convincing reasons" for the ALJ's "adverse credibility

13   determination" regarding the "limiting effects" of Mr. Molina's mental impairments. *See id; see*

14   *also Mark*, 348 F.2d at 293 (reviewing court should uphold "such inferences and conclusions as

15   the [Commissioner] may reasonably draw from the evidence"); *Andrews*, 53 F.3d at 1039–40 (if

16   the evidence supports both the ALJ's decision and a different outcome, the court must defer to the

17   ALJ's decision and may not substitute its own decision).

18       The ALJ's third and final reason for discounting Mr. Molina's testimony was based on his

19   "reported [daily living] activities" which the ALJ found supported a finding that Mr. Molina

20   would be able "to perform a limited range of work."[283] "[I]nconsistencies . . . between [a

21   claimant's] testimony and [his] conduct [or] daily activities" is a legitimate factor "in weighing a

22   claimant's credibility." *Orn*, 495 F.3d at 636; *Molina*, 674 F.3d at 1112. "The ALJ may consider

23   inconsistencies either in the claimant's testimony or between the testimony and the claimant's

24   conduct" including "'whether the claimant engages in daily activities inconsistent with the alleged

25

26   _____

27   [281] AR 24–25.
     [282] AR 25.

28   [283] *Id.*

symptoms.'" *Id.* (quoting *Lingenfelter*, 504 F.3d at 1040). "While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting. Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Id.* 1112–13 (internal quotations and citations omitted); *but see Garrison*, 759 F.3d at 1016 (Ninth Circuit has "repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent" with eligibility for disability benefits; "disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations"); *Smolen*, 80 F.3d at 1284 n.7 ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits . . . .").

Here, the ALJ found that Mr. Molina was able to independently take care of himself, to do basic household chores, and to "help take care of his two children."[284] While Mr. Molina's difficulties in other areas of daily living activities, such as his discomfort in large crowds or in unrestricted public places, like supermarkets, "suggest some difficulty functioning," the ALJ did not err by finding that that Mr. Molina's statements regarding the "limiting effects" of his mental impairments on his ability to perform *all* work were "not entirely credible" given his reported daily activities. *See Molina*, 674 F.3d at 1112–13.

### 3.3 ALJ's Failure to Include All of Mr. Molina's Limitations in its RFC Analysis

On appeal, Mr. Molina contends that the ALJ erred by not including "the moderate limitation in interacting with supervisors" in her RFC, quoting *Hill v. Astrue* for the proposition that "[i]f a vocational expert's hypothetical does not reflect all the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy." 698 F.3d 1153, 1162 (9th Cir. 2012).[285]

---

[284] AR 24.

[285] Motion for Summary Judgment – ECF No. 17 at 17 (citing AR 23).

Here, the evidentiary record is clear that the ALJ gave the VE a complete hypothetical reflecting Mr. Molina's limitations, including the moderate limitation on his ability to interact with supervisors.[286] As such, *Hill* does not support Mr. Molina's claim of error. Moreover, to the extent that Mr. Molina also contends that the ALJ erred by not specifically referencing Mr. Molina's "moderate limitation in interacting with supervisors" in Section 4 of the ALJ's "Findings of Fact and Conclusion of Law," this court finds any such error to be harmless, as this limitation was clearly presented to the VE and incorporated into the hypotheticals opined upon by the VE, and relied upon by the ALJ. *See Molina*, 674 F.3d at 1111 (reviewing court will "not reverse an ALJ's decision on account of an error that is harmless"). Finally, the ALJ also did not err by not incorporating medical opinion evidence or testimony which she had already permissibly given minimal evidentiary weight. *See Batson*, 359 F.3d at 1197.

## CONCLUSION

The court denies Mr. Molina's motion for summary judgment and grants the Commissioner's cross-motion for summary judgment.

**IT IS SO ORDERED.**

Dated: June 28, 2017

_____
LAUREL BEELER
United States Magistrate Judge

United States District Court
Northern District of California

---

[286] *See* AR 60 (in posing its hypothetical to the VE, the ALJ stated that "[i]n terms of contact with supervisors, this individual should receive instructions for the shift at the beginning of the shift and should have only occasional contact with supervisors after that initial explanation of the day's duties").